# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0122V

|  |  |
|---|---|
| CRYSTAL RICHARDSON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: March 3, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Heather V. Menezes, Shaheen & Gordon P.A., Manchester, NH,* for Petitioner.

*Adam Nemeth Muffett, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On January 27, 2023, Crystal Richardson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left-sided shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccine received on October 21, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages figure, and their dispute was therefore submitted to resolution at a "Motions Day" proceeding on February 28, 2025.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of $129,489.53 (representing $127,500.00 for past pain and suffering, plus $1,989.53 for past unreimbursable expenses).**

## I.     Procedural History

The case was assigned to SPU in May 2023. ECF No. 8. Respondent conceded entitlement of Petitioner's left SIRVA in a Rule 4(c) Report (ECF No. 19), and I accordingly issued a corresponding Ruling (ECF No. 20) in December 2023. The parties quickly reported an impasse in their respective valuations of the case, *see* Status Report (ECF No. 21), and briefed the subject. Damages Brief filed Feb. 1, 2024 (ECF No. 23); Response filed Mar. 18, 2024 (ECF No. 24); Reply filed Mar. 22, 2024 (ECF No. 25). Afterwards, Petitioner then filed a short affidavit about her childcare arrangement (in response to argument in Respondent's Response). Ex. 10 (ECF No. 29). The parties also confirmed their joint stipulation of the reimbursement of $1,989.53 for past unreimbursable expenses. Accordingly, they only disputed the appropriate award for past pain and suffering. Joint Status Report filed Jan. 22, 2025 (ECF No. 31).

At the end of the February 28, 2025 expedited hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

## II.    Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Yodowitz v. Sec'y of Health & Hum. Servs.*, No. 21-370V, 2024 WL 4284926, at *2 – 3 (Fed. Cl. Spec. Mstr. Aug. 23, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

### III.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The evidence establishes that Petitioner (a 34-year-old mother of two) received the flu vaccine in her non-dominant left arm on October 21, 2020. Ex. 5 at 26, 30. She was employed full-time as an auditor at a credit union, which appears to be a desk-based job. Ex. 6 at 18. She was healthy, with no history of shoulder pain or dysfunction. Rule 4(c) Report at 2.

After initially trying to manage the pain with over-the-counter medication, Petitioner promptly sought formal medical attention. Just 12 days post-vaccination, on November 2, 2020, she saw her primary care provider ("PCP") (who obtained an X-ray, which was unremarkable), and also established care with an orthopedic surgeon. Ex. 5 at 13 – 14; Ex. 6 at 15.[4] After four physical therapy ("PT") sessions (see Ex. 6 at 85 – 97), on November 16, 2021), the orthopedist opined that Petitioner's "left shoulder was not getting better on its own," and he administered a steroid injection. Ex. 6 at 13 – 14.

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[4] The orthopedic records suggest significant and persistent limitations in range of motion ("ROM") particularly on external rotation (noted to be 35 degrees at the initial evaluation, *see* Ex. 6 at 15, and only reaching 45 degrees at the final post-surgical appt. in August 2021, Ex. 7 at 8. Respondent argues, perhaps correctly, that the concurrent physical therapy records more accurately document that Petitioner's ROM improved over time especially after her surgery.

3

One month later, on December 18, 2021, Petitioner reported that the steroid injection had "definitely helped" but was "starting to wear off." Ex. 6 at 11. Concerned that Petitioner's condition was "getting worse," the orthopedist obtained an MRI which was suggestive of a mild acromioclavicular ("AC") joint arthropathy; a shallow Hill-Sachs fracture or micro-fracturing at the posterosuperior humeral head; osseous edema and swelling; capsular strain and capsulitis; and mild peritendinobursitis. *Id.* at 11, 16.

At a January 4, 2021 follow-up orthopedic appointment, Petitioner reported an increasing amount of shoulder pain ever since the steroid injection wore off. Ex. 6 at 10. She had pain every night and pain with overhead activities and it did not appear to be getting any better. *Id.* The orthopedic surgeon recommended, and Petitioner agree to proceed to arthroscopic surgery. Ex. 6 at 10; *see also* Ex. 5 at 6 (January 26, 2021 PCP pre-operative clearance appointment).

That surgery occurred on February 2, 2021, and included subacromial decompression; debridement of anterior-posterior synovitis and labral fraying; and capsular release of superior, anterior, and posterior adhesive capsulitis. The surgery record also notes removal of "significant bursitis." Ex. 6 at 99. Post-surgery, Petitioner was discharged with a sling and a CryoCuff (a form of cold therapy). *Id.* at 9.

There is no dispute that Petitioner's shoulder substantially recovered after her surgery and 20 subsequent PT sessions (occurring from February 3 – April 29, 2021), Ex. 6 at 19 – 84. At the last PT session on April 29, 2021, her shoulder displayed 180 degrees flexion, 75 degrees external rotation, 70 degrees internal rotation, and 80 degrees scaption. She had fully achieved her goals relating to ROM and function, and nearly achieved her goals regarding muscle strength (85%). She was running and attending yoga classes, and sleeping on her left shoulder, with no pain with activities. She voluntarily self-discharged from formal PT, preferring to continue with home exercises. Ex. 6 at 19 – 21; *see also* Ex. 6 at 5 (May 1, 2021 orthopedics follow-up appointment).

Petitioner attended her last orthopedic appointment for her shoulder in early August 2021. She was now "doing much better… able to do more things… occasionally will feel a little sore and occasionally will feel some discomfort with lying on that side, but outside of that, she is back to all of her activities and feels markedly better." The orthopedist recorded that P would "continue with home strengthening program, otherwise no restrictions from my perspective. She still has another six months to gain her full recovery. If there are any issues, she is welcome to come back." Ex. 7 at 8.

I have also reviewed the affidavits submitted in the case. As of August 2022, Petitioner reported that her shoulder was substantially recovered, but she still

4

experienced some stiffness; weakness; and discomfort during sleep. Exs. 3, 4. And in January 2025, Petitioner clarified that a nanny (*see* Response at 16, citing Ex. 6 at 78) did not live in her home, only cared for her children during work hours, and did not do errands or household chores. Ex. 10.

Turning to the parties' respective positions, Petitioner argues that her past pain and suffering warrants an award of $127,500.00, particularly based on comparison to the prior reasoned decisions in *Wilson*, *Rafferty*, and *Nute*. Brief at 8 – 13.[5]

Respondent contends that $127,500.00 would be "excessive" for this case. Response at 2. He seeks to distinguish this case from *Rafferty* and *Wilson*, mostly based on the duration between each vaccination and the end of formal treatment. *Id.* at 12 – 14. He advocates for an unspecified lower figure, and provides a table of ten prior reasoned decisions involving SIRVAs with "surgeries or special extenuating circumstances," which resulted in past pain and suffering awards ranging from *$95,000.00 – $205,000.00* for past pain and suffering. *Id.* at 11 – 12 (internal citations omitted). At the February 28, 2025, expedited hearing, upon my questioning about which of Respondent's citations were most instructive here, Respondent's counsel mentioned *Meyers*, which resulted in a past pain and suffering award of $125,000.00.[6]

As explained at the hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. But I will not diverge from the Program's accumulated experience from deciding hundreds of SIRVA pain and suffering cases, including the six-figure "baseline" for surgery cases, unless a case is shown to be a true "outlier." The parties should use the general landscape of past pain and suffering awards, and specific past reasoned decisions that they believe to be directly "on point," when presenting their specific valuations of a case that is formally in damages. That information, when offered by the parties, can be highly useful in guiding my award.

Overall, Ms. Richardson's pain and suffering was roughly similar to that in her cited cases (*Wilson*, *Rafferty*, and *Nute*). Respondent correctly notes that those cases involved longer timeframes between vaccination and the end of formal treatment (roughly eleven months in each case). Response at 13 – 14. But that durational measure does not explain the severity of each injury – at least not alone. For instance, *Rafferty* included a two-month initial treatment delay, and "significant improvement" of the SIRVA within roughly

---

[5] Citing *Wilson v. Sec'y of Health & Hum. Servs.*, No. 19-35V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (awarding $130,000.00 for past pain and suffering); *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) ($127,500.00); *Nute v. Sec'y of Health & Hum. Servs.*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019 ($125,000.00).

[6] *Meyers v. Sec'y of Health & Hum. Servs.*, No. 20-779V, 2024 WL 706877 (Fed. Cl. Spec. Mstr. Jan. 12, 2024) (awarding $125,000.00 for past pain and suffering).

seven months post-vaccination (followed by several more months of a home exercise program). 2024 WL 3495956, at *15 – 16. Moreover, Ms. Richardson will not be penalized for undergoing shoulder surgery relatively quickly (two and one-half months post-vaccination, compared to five months post-vaccination for the *Rafferty* petitioner). While Ms. Richardson's early surgical intervention resulted in a faster substantial recovery, it also demonstrates the severity of the acute injury, and her orthopedic surgeon's decision against more conservative measures.

Otherwise, I view the *Rafferty* petitioner's prescription prednisone and eight PT sessions prior to surgery as roughly similar to Ms. Richardson's one steroid injection and four PT sessions prior to surgery. And while the *Rafferty* petitioner was the primary caregiver to three-year-old twins – one of whom suffered from autism - Ms. Richardson also had substantial caregiving obligations for two toddlers, who were only with a nanny while Ms. Richardson and her husband were at their full-time jobs.

There are also similarities between Ms. Richardson and the *Meyers* petitioner. Each sought treatment promptly, and had early assessments of limited ROM and developing adhesive capsulitis, high subjective pain ratings, periods of relief from steroid injection(s), somewhat mild MRI findings (e.g., with little to no tearing), arthroscopic surgery, and about 20 post-operative PT sessions, followed by substantial recovery. 2024 WL 706877 at *4. The most significant difference is the overall duration of treatment, because the *Meyers* petitioner attempted more conservative measures (unsuccessfully) for several more months than Ms. Richardson did. *Id.* The *Meyers* opinion briefly references the petitioner's employment as a dental hygienist, *id.* at 2, which was likely more "hands on" and impacted by a shoulder injury than Ms. Richardson's auditor job. However, the Meyers opinion does not describe any impacts on the petitioner's *personal* life. In comparison, Ms. Richardson has explained that the SIRVA disrupted her ability to care for her two very young children – which should be factored into the pain and suffering award.

Overall based on my review of this case and comparison to *Rafferty*, *Wilson*, and *Meyers*, I find it appropriate here to award $127,500.00 for past pain and suffering.[7]

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum of $129,489.53 (representing $127,500.00 for past pain and suffering, plus $1,989.53 for past unreimbursable expenses) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.